IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

**CAROL L. SAVAGE**                                                                                    **PLAINTIFF**

vs.                                        Civil No. 2:19-cv-02055-PKH-MEF

**ANDREW M. SAUL, Commissioner,**                                              **DEFENDANT**
**Social Security Administration**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Carol L. Savage, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

### I.       Procedural Background

Plaintiff protectively filed her current applications for DIB and SSI on June 10, 2013. (ECF No. 11, p. 23, 145, 146, 300-06, 307-12). Plaintiff alleges disability since April 25, 2009, due to back injury, severe depression, severe anxiety, and slight agoraphobia. (*Id*., pp. 23, 365).

Plaintiff's applications were denied initially and upon reconsideration. (*Id*., pp. 23, 204, 210). An administrative hearing was held on October 13, 2015, before the Hon. Glenn A. Neel, Administrative Law Judge ("ALJ"). (*Id*., pp. 95-144). Plaintiff and a vocational expert ("VE"), Monty Lumpkin, testified. (*Id*.). Plaintiff was represented by counsel, David Harp. (*Id*.).

1

By written decision dated April 27, 2016, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, degenerative disc disease of the thoracolumbar spine status post-surgery, lumbago, chronic obstructive pulmonary disease (COPD)/asthma, major depressive disorder/mood disorder, anxiety disorder, and pain disorder. (*Id.*, pp. 20, 25-26). The ALJ next determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any impairment in the Listing of Impairments. (*Id.*, pp. 26-27). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to:

> "[P]erform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except she is limited to occasional balancing, stooping, kneeling, crouching, and crawling; occasional climbing of ramps and stairs; and no climbing of ladders, ropes, or scaffolds. In addition, she must avoid concentrated exposure to temperature extremes, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. The claimant is further able to perform simple, routine, repetitive tasks with only incidental interpersonal contact with coworkers and supervisors, no contact with the public, and simple, direct, and concrete supervision. (*Id.*, pp. 27-35).

The ALJ found that Plaintiff was unable to perform any of her past relevant work ("PRW"), but with the assistance of the VE the ALJ determined Plaintiff could perform the requirements of the representative occupations of: filling and closing machine filler (DOT # 529.685-282), with 25,192 jobs in the national economy; labeler (DOT # 920.687-126), with 24,738 jobs in the national economy; and, compression molding machine tender (DOT # 556.685-022) with 7,226 jobs in the national economy. (*Id.*, pp. 35-36). The ALJ concluded that Plaintiff had not been under a disability as defined by the Act during the relevant period. (*Id.*).

Plaintiff filed an appeal, and the Commissioner filed an unopposed motion requesting Plaintiff's case be remanded pursuant to sentence four of section 405(g). (*Id.*, p. 998-99). The Court found remand for the purpose of further evaluation of the evidence appropriate and granted

the Commissioner's unopposed motion to remand the case for further consideration on October 3, 2017. (*Id.*, p. 1005).

A second administrative hearing was held before the Hon. Glenn A. Neel, ALJ, on June 20, 2018. (*Id.*, pp. 935-61). Plaintiff and VE, Deborah Steele, testified. (*Id.*). Plaintiff was again represented by counsel, David Harp. (*Id.*).

By written decision dated April 17, 2019, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine with cervicalgia; degenerative disc disease of the thoracolumbar spine status post-surgery; lumbago; bilateral chondromalacia of the patellas; migraines; chronic obstructive pulmonary disease (COPD)/asthma; residual effects of left upper extremity injury; major depressive disorder/mood disorder; anxiety disorder; and, pain disorder. (*Id.*, pp. 908, 914). The ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any impairment in the Listing of Impairments. (*Id.*, pp. 914-17). The ALJ found that Plaintiff retained the RFC to:

> "[P]erform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that she can occasionally climb ramps and stairs but can never climb ladders, ropes, and scaffolds. She can occasionally balance and stoop but cannot kneel, crouch, or crawl. The claimant cannot reach or work overhead with the non-dominant left upper extremity. The claimant can frequently, but not constantly, reach in all other directions with the non-dominant left upper extremity. The claimant can frequently, but not constantly, reach in all other directions with the non-dominant left upper extremity. She must avoid concentrated exposure to temperate extremes, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, including no driving as a part of work. Furthermore, the claimant can perform unskilled work with simple, routine, and repetitive tasks in an environment where interpersonal contact with coworkers and supervisors is incidental to the work performed and there is no contact with the public and where the supervision required is simple, direct and concrete. (*Id.*, pp. 917-24).

The ALJ found that Plaintiff was unable to perform any of her PRW, but with the assistance of the VE the ALJ determined Plaintiff could perform the requirements of the representative occupations of: office helper (DOT # 239.567-010), with 156.940 in the national economy; clerical

order caller (DOT # 209.667-014), with 212,795 jobs in the national economy; and, photo copy machine operator (DOT # 207.687-014) with 22,235 jobs in the national economy. (*Id*., pp. 924-25). The ALJ concluded that Plaintiff had not been under a disability as defined by the Act during the relevant period. (*Id*., p. 925).

Plaintiff subsequently filed this action on May 3, 2019. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 16, 17), and the case is ready for decision.

## II.  Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. The complete sets of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

On July 8, 2009, Plaintiff was examined by Laura Hahn, APRN, at Yakima Medical Consultants and a report was provided by Dr. S. Daniel Seltzer. (*Id*., p. 451-56). Plaintiff had no prior history of problems with her neck or left shoulder until she began a new type of work as an order filler and began developing pain and burning in her left shoulder and left arm. (*Id*.). She had tried physical therapy and medication with no relief, and the pain affected her ability to sleep. (*Id*.). An MRI of the left shoulder from June 10, 2009 was grossly normal. (*Id*., p. 452). A physical examination showed decreased range of motion with pain and some guarding on flexion and extension in Plaintiff's cervical spine. (*Id*.). Examination of the right shoulder was within normal limits, but Plaintiff had so much anxiety and hesitancy that APRN Hahn found it very difficult to perform an adequate muscular examination on the left side. (*Id*., p. 453). X-rays were taken of Plaintiff's thoracic and cervical spine which revealed no abnormalities in her thoracic spine and some straightening and loss of the normal lordotic curve in Plaintiff's cervical spine.

(*Id*., p. 455).  Plaintiff's diagnoses were: (1) no obvious sign of internal derangement of the left shoulder; (2) probably cervical source of discomfort including cervical radiculopathy; (3) large component of anxiety and apprehension; and, (4) impending or incipient frozen shoulder secondary to guarding and lack of movement. (*Id*., p. 455). An MRI of Plaintiff's cervical spine and an EMG and nerve conduction study of the left upper extremity were recommended to determine a treatment plan. (*Id*.). Plaintiff was to be tried on a TENS unit and a trial of either Lyrica or Cymbalta. (*Id*.). Plaintiff was advised that tobacco cessation was important as well as continuation of range of motion and stretching for the left shoulder to prevent the development of frozen shoulder. (*Id*.).

On July 15, 2011, APRN Hahn opined Plaintiff's condition was medically fixed, and she would be permanently restricted to light duty with no overhead activity on repetitive manner with a limit of lifting to three pounds occasionally. (*Id*., p. 583).

On December 12, 2011, Plaintiff had a consultation with Michael Gillespie, M.D., orthopedist, and Eugene Wong, M.D., neurologist. (*Id*. pp. 601-624). An MRI of her left shoulder showed tendinosis changes, but an intact rotator cuff and the shoulder was noted to be normal. (*Id*., p. 621). They noted there was a great deal of symptom magnification and self-limiting activity with her left shoulder which did not suggest a true adhesive capsulitis or a specific neuromuscular problem. (*Id*.). Her gait was noted to be normal, and a pushup maneuver against the wall to examine the movement of her scapulae was declined by Plaintiff due to anticipated pain. (*Id*., p. 619). She did not have an antalgic gait and could fully squat and pull up three times without her hands, could balance on either foot but could not hop, and could kneel. (*Id*., p. 618).

On January 17, 2013, Plaintiff had an independent medical examination performed by Ronald L. Vincent, M.D., at OMAC. (*Id*., p. 470-84). She was noted to have a slow, cautious, but

normal gait and tandem walking was done without any difficulty. (*Id*., p. 481). She was diagnosed with left shoulder strain; degenerative disc disease at C5-C6 of the cervical spine; minimal degenerative disc of the thoracic spine; and, cervical and thoracic strain which temporarily aggravated her degenerative disc disease at C5-C6. (*Id*., p. 483). Dr. Vincent found Plaintiff was not a candidate for any further treatment, and there would be no permanent work restrictions as a result of her industrial injury. (*Id*.). Dr. Vincent also noted Dr. Gillespie felt there was no permanent impairment as related to her left shoulder, and he concurred. (*Id*., p. 484).

On February 27, 2013, Plaintiff saw APRN Hahn again and reported she still had upper extremity pain which was occasionally controlled with an over-the-counter medication, and Plaintiff was upbeat and stable on 150 mg of Zoloft daily. (*Id*., p. 468). Diagnoses provided were a history of left shoulder sprain; history of subscapularis nerve irritation; history of cervical and thoracic spine sprain; and, depression with an episode of one suicidal ideology. (*Id*.). Plaintiff was restricted to light duty and was instructed to continue her Zoloft. (*Id*.).

On March 25, 2013, Plaintiff had a follow up appointment with APRN Hahn and had some questions about her claim. (*Id*., p. 467). She reported her attorney would like to have a new rating exam before full closure and a psych consultation as well. (*Id*.). Diagnoses provided were history of left shoulder sprain; history of subscapularis nerve irritation; history of cervical and thoracic spine sprain; and, depression. (*Id*.). APRN Hahn supported the request for an independent psychiatric exam and requested a vocational counselor's final report, but she expressed uncertainty as to whether a physical capacity exam was necessary. (*Id*.).

On May 9, 2013, Plaintiff had a psychological/psychiatric evaluation with Aaron R. Burdge, Ph.D. (ECF No. 11, pp. 433-50). She reported no history of mental health issues or treatment and no history of suicide attempts. (*Id*., p. 433). She was diagnosed with anxiety

disorder and mood disorder, both due to chronic neck and back pain. (*Id*., p. 435). Dr. Burdge marked severe for the impact of her impairments on her ability to maintain a schedule, attendance, and punctuality, working without interruptions from her symptoms, and maintaining appropriate behavior in a work setting. (Id, p. 436). However, he also marked that vocational training or services would eliminate barriers to employment. (*Id*.). A Personality Assessment Inventory was done, and diagnostic considerations were found to be major depressive disorder, social phobia, somatization disorder, and paranoid personality disorder. (*Id*., p. 448).

On October 10, 2013, APRN Hahn noted Plaintiff had been in a work hardening program for almost two weeks but had noticed an increase of pain in her neck and upper extremities since starting the program. (*Id*., p. 522). Diagnoses provided were a history of left shoulder sprain, a history of subscapularis nerve irritation, a history of cervical and thoracic spine sprain, and depression along with a mood disorder and anxiety. (*Id*.).

On October 21, 2013, Plaintiff was seen by APRN Hahn and reported she was doing much better now that she was back on the Wellbutrin. (*Id*., p. 515). She had quit her work hardening program a week and a half before because she had no transportation to get to the physical therapy office. (*Id*.). Plaintiff was noted to display no issues of chronic pain disorder, with fairly good range of motion of the upper extremity and cervical spine with minimal difficulty. (*Id*.). She had no tenderness noted with deep palpation to the cervical spine or the shoulders. (*Id*.).

On November 11, 2013, Frederick Montgomery, M.D., performed a psychiatric examination. (*Id*., pp. 527-531). A Minnesota Multiphasic Personality Inventory ("MMPI") was completed, and Dr. Montgomery noted the elevated T score invalidated the clinical scales and suggested Plaintiff was dealing with stresses that were beyond her ability to manage. (*Id*.). Dr. Montgomery opined that psychiatric treatment, if associated with a work hardening program and

7

a vocational program, could return Plaintiff to gainful employment over a period of six months, but all the treatments would have to be done concurrently. (*Id*., p. 531, 546-47).

On September 17, 2015, Plaintiff was seen at Perspectives Behavioral Health and reported she had been diagnosed with depression and anxiety. (*Id*., p. 1153). She reported that she had been doing well since moving but that she was starting to "get to that weeping point" since she had run out of medication and thought she needed to get back on some medication. (*Id*.). She reported having been treated in Washington for depression, which had started in 2009 after hurting her back. (*Id*., p. 1154). She had not been able to work and stayed in her house, and she didn't feel like doing anything or being around anyone. (*Id*., pp. 1154-55). She reported she had previously had persistent suicidal thoughts, but now only every once in a while. (*Id*.). Her anxiety started in 2012 after a work injury and being off work. She shared that being cooped up made her more anxious, and her anxiety was always around life stressors such as bills, SSI problems, and kids. (*Id*., p. 1155). In her substance abuse screening, she reported she was having at least four alcohol drinks within one day at least once a week, and she was smoking nearly every day. (*Id*., p. 1156). She was diagnosed with depression, recurrent, moderate with moderate/severe anxious distress. (*Id*., p. 1158).

On September 20, 2016, Plaintiff had a new patient visit with Jody A. Bradshaw, M.D., at Mercy clinic for bilateral knee pain that had begun in the last year or two but had worsened in the last six months. (*Id*., p. 1198). A physical examination revealed no erythema or effusion, and a stable ligamentous exam. (*Id*.). However, there was a small, soft, mobile, but nontender mass behind the patellar tendon. (*Id*.). She had tenderness along the joint line with mild patellar crepitus. (*Id*.). Dr. Bradshaw noted Plaintiff had benign looking X-rays but wanted to do MRI scans of both Plaintiff's knees particularly in light of the mass on Plaintiff's left knee. (*Id*.).

8

Plaintiff had MRI scans of her knees that day. (*Id*., p. 1194). The MRI of her left knee showed mild chondromalacia patella, a small joint effusion, and no gross abnormality of the distal patellar tendon complex. (*Id*.). The MRI of her right knee showed moderate chondromalacia patella, joint effusion, and a minimal irregularity of the posterior horn medial meniscus although not a definite tear. (*Id*.).

On October 7, 2016, Plaintiff was seen by Dr. Bradshaw for an MRI follow up. (*Id*., p. 1192). Both MRI's of Plaintiff's knees showed chondromalacia underneath the patella with mild underlying bone edema. (*Id*.). A physical examination revealed no erythema or effusion, with well-maintained motion from 0-135, and a stable ligamentous exam. (*Id*.). She had pain with patellar compression, mild patellar crepitus, and tenderness along her medial and lateral patellar facets. (*Id*.). Dr. Bradshaw gave Plaintiff injections in both knees. (*Id*.). Dr. Bradshaw noted she did not think Plaintiff was a very good candidate for arthroscopy. (*Id*.).

On January 19, 2017, Plaintiff was seen by Dr. Bradshaw for knee pain, with complaints of grinding underneath her patella. (*Id*., p. 1190). Her knee injections the previous October had helped for a while and taking 800 mg of Ibuprofen had helped. (*Id*.). Plaintiff was given injections in both knees. (*Id*.).

On October 10, 2017, Plaintiff was seen by Wanda McMichael, M.D., to discuss her sleep study results, which were normal. (*Id*. p. 1241). Her breathing had been okay, but she was still snoring and had some cough and wheezing when she lay down at night. (*Id*.). She was using a nebulizer four to five times a day and a fast-acting inhaler, but her insurance would not pay for any long acting inhalers. (*Id*.). Her mood swings were better, but she was still having trouble with pain in her knees, low back, and fingers. (*Id*.). Her physical exam was largely normal, but with some tenderness under the inferior border of her left scapula. (*Id*., p. 1244).

9

On November 16, 2017, Plaintiff was seen at Perspectives for an annual recertification and reported she was doing pretty well. (*Id*., p. 1167). Her medications had been adjusted over the year, and she reported stabilized mood and energy and felt that she was benefitting from both medication and therapy management. (*Id*.). She was trying to stop smoking and reduced her cigarette consumption to 4-5 cigarettes per day. (*Id*., p. 1168).

On December 21, 2017, Plaintiff was seen by Mervin Leader, M.D., at Perspectives after she had Zyprexa decreased due to concerns about weight gain while transitioning to Prozac from Xanax and adding Latuda. (*Id*., p.1173). Plaintiff reported decreased anxiety, decreased appetite, and five pounds of weight loss. (*Id*.). She had also stopped taking Xanax on her own for the past two weeks but had tolerated it well. (*Id*.).

On May 14, 2018, Plaintiff was seen by Dr. McMichael with worsening migraines, but stable COPD. (*Id*., p. 1294). She had cut down on smoking and was breathing a whole lot better. (*Id*.).

On August 23, 2018, Perspectives made an updated treatment plan for Plaintiff. (*Id*., pp. 1366-71). Her diagnosis remained depression, recurrent, moderate with moderate/severe anxious distress. (*Id*., p. 1366). She was recommended to have therapy one to two times per month, and pharmacological management one to three times per six months. (*Id*., p. 1367). Barriers to treatment included a history of noncompliance with attending therapy appointments, financial problems, and health problems. (*Id*.). Her prognosis was noted to be fair. (*Id*., p. 1371). The treatment plan was signed by Plaintiff, Amber Waite, LPE-1, and Max Baker, M.D. (*Id*.).

On September 7, 2018, Plaintiff had a medication check with Brent Witherington, M.D., at Perspectives, and she reported her Prozac was not working as it caused diarrhea, but she felt she did better on the higher dose of Latuda. (*Id*., p. 1373). Plaintiff's Prozac was discontinued as she

was not taking it, and she was prescribed Lithium Carbonate for treatment resistant depression. (*Id*., p. 1375, 1377). Plaintiff was told to have labs done in one week, and therapy and one-half hour of daily exercise were encouraged. (*Id*., p. 1377).

On September 25, 2018, Plaintiff was seen by Dr. Witherington for a medication check and reported the lithium had been helping with her moods and depression. (*Id*., p. 1380). She reported doing a little better overall, and improved sleep maintenance. (*Id*.). Plaintiff was continued on Latuda and lithium, encouraged to complete the lab work as previously ordered, and encouraged to participate in therapy and one-half hour of daily exercise. (*Id*., p. 1384).

On September 25, 2018, Plaintiff was seen by Dr. McMichael for a cough and chest congestion she had been having for the past week and a half. (*Id*., p. 1347). She was more out of breath than usual, wheezing, and her chest was sore from coughing. (*Id*.). She was diagnosed with acute bronchitis and given a z-pack as it had not improved in 10 days and due to her history of COPD. (*Id*., p. 1352).

### III.  Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477

(8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least 12 consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. *McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).

## IV. Discussion

Plaintiff raises the following issues in this appeal: (1) whether the ALJ properly considered Plaintiff's subjective complaints; (2) whether the ALJ's RFC determination is inconsistent with the record; and, (3) whether the Step Five finding was based upon a hypothetical that was incomplete. (ECF No. 16, pp. 18-26).

### A. Subjective Complaints

Plaintiff argues the ALJ essentially skipped the step of evaluating Plaintiff's subjective complaints in his evaluation. (ECF No. 16, pp. 24-25). She argues the ALJ did not discuss the necessary factors and failed to give credence to factors such as her change in daily activities, hardships suffered due to inadequate finances and attempted treatments, medical records, and her failed work hardening attempt. (*Id*.). Plaintiff contends the ALJ failed to explain his dismissal of her subjective complaints and, therefore, did not meet the applicable standards. (*Id*.).

The ALJ is required to consider all the evidence relating to Plaintiff's subjective complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) function restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians. *Polaski*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them. *Id*. However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Wright v.* Colvin, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation

omitted). The Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

The ALJ considered Plaintiff's subjective complaints, including her difficulties with personal care due to left arm pain, difficulties doing household chores requiring repetitive movements, pain going up or down ramps or stairs, inability to stand for more than 30 minutes, inhaler and nebulizer use, migraines, incontinence, and mood swings not controlled by medications. (ECF No. 11, p. 918).

While the ALJ did consider objective medical evidence and physicians' findings that the physical abnormalities in her shoulder and knee were mild, this was not the only evidence he considered. (*Id.*, p. 919). The ALJ considered Plaintiff's reports that she was exercising by stretching one to two times per day. (*Id.*, pp. 475, 920). He considered physical examinations performed by both consultative and treating medical providers which showed fairly good range of motion in the upper extremities, as well as a normal gait and an ability to squat. (*Id.*, p. 919). He also considered that Plaintiff continued to smoke, despite her COPD diagnosis, and Dr. McMichael's note on May 14, 2018 noting improvement in Plaintiff's breathing after she cut down on her smoking. (*Id.*, p. 921). The ALJ also considered Plaintiff's reports to treating providers in 2013 that she was doing well on Zoloft and Wellbutrin; her reports in 2017 that she was doing well on her then current medication and therapy regimens; as well as her report that she had tolerated not taking Xanax for two weeks while being weaned off of Xanax and her Prozac increased. (*Id.*, p. 921).

While the ALJ did not specifically address her failed work hardening attempt in his opinion, the Court notes this attempt did not fail due to Plaintiff's impairments. Although Plaintiff

14

did report an increase in pain while attempting work hardening, she ultimately reported that she had quit the work hardening due to transportation problems. (*Id.*, p. 515).

Although it is clear Plaintiff suffers from some degree of limitation, she has not established that she was unable to engage in any gainful activity during the time period in question. Accordingly, the Court finds that substantial evidences supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

**B.** **RFC Determination**

Plaintiff argues the ALJ erred in determining both her physical RFC and mental RFC. (ECF No. 16, p. 118-24).

A disability claimant has the burden of establishing her RFC. *Vossen*, 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3) and 416.945(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Plaintiff asserts the ALJ erred in his evaluation of Plaintiff's ability to use her left upper extremity, as the limitations opined by APRN Hahn were incompatible with light work. (ECF No. 16, p. 20). She argues the ALJ failed to consider the longitudinal record as a whole and that his

unwillingness to defer to the limitations of APRN Hahn, as a treating medical provider, was clear error. (*Id*.). However, Plaintiff's argument ignores the additional limitations on her left upper extremity in the RFC determination. (*Id*.). The ALJ did find Plaintiff could perform light work, but he also found she could not reach or work overhead, and that she could frequently but not constantly reach in all other directions with her left upper extremity. (ECF No. 11, p. 917). The ALJ expressly considered APRN Hahn's limitations provided in the treatment record and gave credit to her opinion that Plaintiff could do only light duty jobs without overhead work. (*Id*., pp. 577, 708, 919, 922). Further, the ALJ was not required to rely entirely upon any one opinion, even that of a treating physician. *See Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (holding ALJ is not required to rely entirely on a particular physician's opinion). Additionally, APRN Hahn would not be considered an acceptable medical source under 20 CFR §§404.1502, as the initial claim in this case was filed before March 27, 2017, so her opinion would not be considered with the same level of deference afforded a treating physician. While the ALJ assigned little weight to APRN Hahn's opinion that Plaintiff could not lift more than three pounds, as it was not consistent with the definition of light work referenced by APRN Hahn or the other objective findings, he gave credence to APRN Hahn's opinion that claimant could do only light duty jobs and could not do overhead work or reaching with her left upper extremity. (*Id*., p. 922). The ALJ also expressly considered an electrodiagnostic study done in 2010 on Plaintiff's upper extremities which was essentially normal, and Dr. Gillespie and Dr. Wong's examinations and findings that the MRI of her left shoulder showed tendinosis changes but an intact and normal rotator cuff. (*Id*., p. 919).

Plaintiff next argues the ALJ erred more generally in finding an RFC of light work, as her pain increased during her work hardening program even with APRN Hahn's restrictions to occasional sitting, standing, walking, twisting, bending, reaching with the left, and working above

shoulder level on the left. (ECF No. 16, p. 21). She further argues that the more recent evidence of knee pain would prevent Plaintiff from standing and walking for six hours per day as required by light work. (*Id*). As discussed above, Plaintiff voluntarily quit the work hardening program due to issues with transportation, which does not show she was unable to tolerate the program due to physical limitations. (ECF No. 11, p. 515). The ALJ considered an x-ray taken on September 20, 2016 which showed only minor narrowing of the medial compartment of the left knee. (ECF No. 11, p 919). He also considered MRI scans of both knees from September 2016, which showed moderate chondromalacia of the patella and join effusion in the right knee, and only mild chondromalacia of the patella and a small joint effusion in the left knee. (*Id*.). He also considered the findings of Dr. Gillespie and Dr. Wong in December 2011, noting Plaintiff did not have an antalgic gait and could fully squat. (*Id*.). The ALJ considered the opinion evidence of non-examining physician Robert Hoskins, M.D., whose opinion was less restrictive than the final RFC finding, but who found Plaintiff could sit and stand and/or walk for six hours during an eight-hour workday, and no limitations in her ability to balance, kneel, or climb ramps and stairs. (*Id*., p. 921). The ALJ discounted Dr. Hoskins opinion to the extent that his opined postural and manipulative limitations were absent or insufficient. (*Id*., p. 922). He also considered APRN Hahn's opinion that the claimant could do only light duty jobs. (*Id*).

Plaintiff additionally argues the ALJ erred in failing to find stamina limitations in consideration of the COPD. However, the ALJ expressly considered her COPD and found her continuation of smoking, as well as her medical improvement when she cut back, indicated her symptoms were not as intense as alleged. (ECF No. 11, p. 921). Nevertheless, the ALJ ultimately specified environmental limitations in his RFC determination. (*Id*., p. 917).

Regarding Plaintiff's mental impairments, she argues the ALJ relied too heavily upon the 2013 findings of the state agency medical consultants and erroneously discredited Dr. Burdge's opinion. (ECF No. 16, p. 23). The ALJ considered the opinions of the state agency medical consultants, however, he also considered the opinion given by Dr. Burdge. (ECF No. 11, p. 923). The ALJ also considered Plaintiff's improvement with treatment, relying upon medical records from Perspectives, and the opinions from Dr. Montgomery and the treating psychiatrist, Dr. Leader. (*Id*., p. 921).

An ALJ may decide within a "zone of choice," and reversal is unwarranted simply because some evidence might support a different conclusion. *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). Here, the ALJ's RFC determination falls within the zone of choice and is supported by the medical and other evidence of record.

**C.     Hypothetical to the Vocational Expert**

Plaintiff argues that while the hypothetical posed to the VE aligned with his RFC finding, the hypothetical did not contain the proper set of limitations. (ECF No. 16, p. 26). "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). The ALJ's hypothetical question included all the limitations found to exist by the ALJ and set forth in the ALJ's RFC determination. *Id*. Based on the previous conclusion that the ALJ's RFC findings are supported by substantial evidence, the hypothetical question to the VE was proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits. *Id*.; see also *Lacroix*, 465 F.3d at 889.

## V. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and that Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the District Court.**

DATED this 2nd day of March 2020.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE